**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| SHARLEEN EDDY, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 10-130 |
| | ) | |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant | ) | |

## MEMORANDUM OPINION

McLAUGHLIN, SEAN J., District Judge.

## I. INTRODUCTION

Sharleen Eddy ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), seeking review of the final determination of the Commissioner of Social Security ("Defendant" or "Commissioner") denying her application for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381 - 1383f ("Act"). This matter comes before the court on cross motions for summary judgment. (ECF Nos. 6, 9). The record has been developed at the administrative level. For the following reasons, the Commissioner's motion will be denied and the Plaintiff's motion will be granted only to the extent she seeks a remand for further consideration.

## II. PROCEDURAL HISTORY

Plaintiff filed for DIB and SSI with the Social Security Administration September 20, 2007, claiming an inability to work due to disability beginning March 1, 2004. (R. at 98 – 105)[1]. Plaintiff was initially denied benefits on February 1, 2008. (R. at 75 – 84). A hearing was

---

[1] Citations to ECF Nos. 4 – 4-3, the Record, *hereinafter*, "R. at __."

scheduled for May 27, 2009, and Plaintiff appeared to testify represented by counsel. (R. at 24).

A vocational expert, Edith J. Edwards, also testified. (R. at 24, 94 – 95). The Administrative

Law Judge ("ALJ") issued her decision denying benefits to Plaintiff on June 16, 2009. (R. at 10 –

23). Plaintiff filed a request for review of the ALJ's decision by the Appeals Council, which

request was denied on May 1, 2010, thereby making the decision of the ALJ the final decision of

the Commissioner. (R. at 1 – 5).

     Plaintiff filed her Complaint in this court on May 25, 2010. (ECF No. 1). Defendant filed

his Answer on July 28, 2010. (ECF No. 3). Cross motions for summary judgment followed.

### III. LEGAL STANDARD

     Judicial review of the Commissioner's final decisions on disability claims is provided by

statute. 42 U.S.C. §§ 405(g)[2] and 1383(c)(3)[3]. Section 405(g) permits a district court to review

the transcripts and records upon which a determination of the Commissioner is based, and the

court will review the record as a whole. *See* 5 U.S.C. § 706. When reviewing a decision, the

district court's role is limited to determining whether substantial evidence exists in the record to

support an ALJ's findings of fact. *Burns v. Barnhart,* 312 F.3d 113, 118 (3d Cir. 2002).

---

[2] Section 405(g) provides in pertinent part:

> Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action ... brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business

42 U.S.C. § 405(g).

[3] Section 1383(c)(3) provides in pertinent part:

> The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title.

42 U.S.C. § 1383(c)(3).

Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate" to support a conclusion. *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995)(quoting *Richardson v. Perales,* 402 U.S. 389, 401 (1971)). If the ALJ's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Richardson,* 402 U.S. at 390. When considering a case, a district court cannot conduct a *de novo* review of the Commissioner's decision nor re-weigh the evidence of record; the court can only judge the propriety of the decision in reference to the grounds invoked by the Commissioner when the decision was rendered. *Palmer v. Apfel*, 995 F.Supp. 549, 552 (E.D. Pa. 1998); *S.E.C. v. Chenery Corp.*, 332 U.S. 194, 196 – 97 (1947). In short, the court can only test the adequacy of an ALJ's decision based upon the rationale explicitly provided by the ALJ. The court will not affirm a determination by substituting what it considers to be a proper basis. *Chenery*, 332 U.S. at 196 – 97. Further, "even where this court acting *de novo* might have reached a different conclusion . . . so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings." *Monsour Medical Center v. Heckler*, 806 F.2d 1185, 90-91 (3d. Cir. 1986).

To be eligible for social security benefits under the Act, a claimant must demonstrate that he cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least 12 months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *Brewster v. Heckler,* 786 F.2d 581, 583 (3d Cir. 1986). The ALJ must utilize a five-step sequential analysis when evaluating whether a claimant has met the requirements for disability. 20 C.F.R. §§ 404.1520, 416.920.

The ALJ must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., Pt. 404, Subpt. P, Appx. 1; (4) whether the claimant's impairments prevent him from performing his past relevant work; and (5) if the claimant is incapable of performing his past relevant work, whether he can perform any other work which exists in the national economy. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003). If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given claimant's mental or physical limitations, age, education, and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Doak v. Heckler*, 790 F.2d 26, 28 (3d Cir. 1986).

## IV. EVIDENTIARY RECORD

A.  <u>General Background</u>

Plaintiff was thirty eight years of age at the time of her administrative hearing. (R. at 27 – 28). Plaintiff completed twelfth grade and had received some post-secondary education in cosmetology. (R. at 28, 263). Plaintiff was originally from Meadville, Pennsylvania, relocating to Florida following high school, and returning to the Meadville area in September of 2005. (R. at 33). She operated a cleaning business in Florida, which she continued in Pennsylvania. (R. at 36).

B.  <u>Treatment History</u>

Following her return to Pennsylvania, Plaintiff was diagnosed with and treated for a number of physical and psychological conditions. Plaintiff claimed to have suffered chronic

bronchitis since she was a child, and medical tests in February of 2009 confirmed that Plaintiff suffered from a history of chronic sinusitis and recurrent bronchitis with moderate airway obstruction. (R. at 429).

Plaintiff was discovered to have a baseball sized hemorrhagic cyst attached to her left ovary in 2007. (R. at 200). Plaintiff suffered moderate to extreme abdominal and hip pain that limited her functioning. (R. at 200, 230, 234, 321). No other abnormalities were found which could cause this pain. (R. at 196). Plaintiff underwent a mini open laparotomy to remove the cyst on September 10, 2007. (R. at 238, 242 – 43). The cyst was found to be benign in nature. (R. at 250). Following the surgery, Plaintiff was diagnosed with endometriosis, and underwent a series of treatments for this condition. (R. at 200, 242). Conservative treatment involving Lupron injections into the problem area provided no lasting relief. (R. at 238, 404 – 11). Plaintiff was also prescribed Xanax for her anxiety while undergoing Lupron treatment. (R. at 404 – 11). Eventually, a hysterectomy was required. (R. at 404). The procedure was completed in September of 2008 by Vladimir Nikiforouk, M.D. at the Ohio Valley General Hospital in Pittsburgh. (R. at 393 – 96, 403 – 04). Plaintiff's condition was resolved. (R. at 45).

Plaintiff was also diagnosed with degenerative disc disease. (R. at 200). Imaging studies of Plaintiff's back in June of 2007 established the presence of disc herniations at the L4 – L5 and L5 – S1 levels of Plaintiff's spine. (R. at 247, 256 – 57). However, there was no evidence of central canal stenosis, and only mild right-sided neural foraminal encroachment at the L4 – L5 level. (R. at 247, 256 – 57). Imaging of Plaintiff's neck in April of 2008 showed minimal discogenic changes at the C6 – C7 level of Plaintiff's spine, and was otherwise unremarkable. (R. at 316). Plaintiff claimed to have been suffering from resultant neck, back, and leg pain since late 2006. (R. at 207, 253). The injuries to Plaintiff's back were allegedly attributable to

the strenuous nature of Plaintiff's cleaning business, culminating in an incident wherein Plaintiff suffered immobilizing pain after reaching into her car before going to work one morning. (R. at 253). This pain allegedly rendered Plaintiff non-functional for seven days. (R. at 253).

Plaintiff received some treatment at Conneaut Valley Health Center for her back condition. She frequently phoned her doctor at the Health Center for stronger pain medication. (R. at 220 – 21, 223, 226 – 27). She complained of neck and back pain that would not resolve. (R. at 218, 223 – 24). In May of 2007, she appeared at the Health Center in, "obvious," physical distress. (R. at 224). From that point on, however, Plaintiff was never noted to be in acute distress when visiting the Health Center. (R. at 218, 223 – 24). Physical examinations of her neck in September, October, and December of 2008 all found good range of motion. (R. at 210, 213, 215).

At a July, 2007, physical evaluation with Stuart Anderson, M.D., Plaintiff's pain was noted as being sharp, stabbing, throbbing, aching, and burning in nature. (R. at 207). Plaintiff suffered this pain fairly constantly. (R. at 207). However, despite some paraspinal tenderness and resultant limitation in range of motion, Plaintiff walked without a limp, exhibited no tenderness in her lower extremities, had full range of motion in all joints, had negative straight leg raising test results, had no instability, and showed normal strength. (R. at 207).

At initial treatment sessions at the Meadville Medical Center's pain management clinic in September of 2007, Plaintiff complained of right-sided neck pain, bilateral lower arm pain, and bilateral leg pain. (R. at 253). Exercise, stairs, working, temperature extremes, bending, lifting, sitting, coughing, sneezing, light touch, walking, driving, standing, and stress all exacerbated Plaintiff's pain. (R. at 247). Plaintiff claimed the she had difficulty sleeping as a result of her injury, and often experienced weakness in her lower back, arms, and legs. (R. at 247). While

Plaintiff consistently indicated that her pain was extreme – eight on a pain scale of ten, she did not report the physical components of her pain in a manner consistent with the degree of pain alleged. (R. at 253). Also, she stated that with pain medication her pain was only four on a pain scale of ten. (R. at 247). It was noted that Plaintiff was recommended for pain injections at an earlier time, but had refused the procedure. (R. at 247).

Plaintiff displayed some pain behavior while at the pain management clinic, and had a slow, antalgic, but unaided, gait. (R. at 248). Plaintiff's spine exhibited normal cervical and lumbar lordosis, however, and had normal muscle tone and mass. (R. at 248 – 49). She also had a full range of motion in the cervical and lumbar spine, and her sensation was intact and symmetrical. (R. at 248 – 49). Only diffuse tenderness was noted around her spine. (R. at 248). Plaintiff was unwilling to move her lower extremities for objective testing. (R. at 248 – 49). Lumbar epidural injections were recommended for pain relief, but Plaintiff's motive for seeking pain management was openly questioned in the treatment notes of the pain clinic. (R. at 249). Plaintiff frequently sought opioid pain medications. (R. at 249). The clinic noted that a drug test would need to be completed before any such pain medication was prescribed, because substance abuse was suspected. (R. at 249).

A review of Plaintiff's treatment at the pain clinic by Anthony Colantonio, M.D. in October of 2007 largely mirrored earlier treatment notes. (R. at 245 – 46). He found that Plaintiff exhibited no focal neurological deficits, and her strength and effort were limited only by her reported pain. (R. at 246). Dr. Colantonio recommended epidural steroid injections for pain relief. (R. at 246). He also opined that the depression Plaintiff suffered was likely the result of her chronic pain. (R. at 246). He found it to be noteworthy that Plaintiff attempted to continue her cleaning business in spite of her pain. (R. at 246).

Lastly, Plaintiff claimed – and it was noted – that her physical pains had taken a significant toll on her emotional well-being. (R. at 253 – 54). She would become tearful when describing her pain, increased irritability, anger, and depression. (R. at 254). However, Dr. Anderson found Plaintiff's mood and affect to be normal in 2007. (R. at 207).

Plaintiff was seen by Anthony Ruffa, D.O. at Bay Harbor Family Medicine in Erie, Pennsylvania beginning in January of 2008 for opiate dependence. (R. at 313 – 15). She had taken Suboxone and morphine on the street. (R. at 313 – 15). Plaintiff did not wish her physicians at the Conneaut Valley Health Center to know of her dependence problems. (R. at 313 – 15). She claimed not to be on other medications when she began treatment with Dr. Ruffa. (R. at 313 – 15).

Plaintiff was found to be well dressed with normal speech, good eye contact, appropriate affect, good insight and judgment, no thought disorder, and no suicidal ideation. (R. at 313 – 15). Plaintiff's mood was not depressed. (R. at 313 – 15). The flexion and extension of Plaintiff's back were noted to be intact, as was side bending and rotations. (R. at 313 – 15). Toe and hip raising, and sensation, were also intact. (R. at 313 – 15). Plaintiff was treated by Dr. Ruffa with Suboxone and MS Contin. (R. at 313 – 15).

Plaintiff visited Tariq Qureshi, M.D. at Stairways Behavioral Health Outpatient Clinic in March of 2008 due to claimed depression. (R. at 305 – 08). Plaintiff described feelings of increased anxiety, depression, helplessness, hopelessness, and worthlessness. (R. at 305 – 08). She described being sexually abused by her uncle as a child. (R. at 305 – 08). Plaintiff did not suffer from suicidal ideation, however. (R. at 305 – 08).

Dr. Qureshi noted that Plaintiff was taking Suboxone under the care of Dr. Ruffa for treatment of Vicodin and Percocet addictions. (R. at 305 – 08). Plaintiff claimed she became

addicted after buying the medications off of the street when none of her doctors would prescribe the medications for her. (R. at 305 – 08). Plaintiff demanded throughout her session at Stairways Behavioral Health that she be given a prescription for Xanax for her anxiety, and was upset when her requests were denied. (R. at 305 – 08).

Plaintiff was found to be uncooperative and demanding, and exhibited limited insight and judgment. (R. at 305 – 08). Plaintiff was otherwise alert and oriented, and without delusions, hallucinations, suicidal ideation, obsessions, compulsions, or phobias. (R. at 305 – 08). Plaintiff was diagnosed as suffering from a mood disorder and a history of substance abuse. (R. at 305 – 08). Dr. Qureshi assigned Plaintiff a global assessment of functioning[4] ("GAF") score of 65. (R. at 305 – 08).

Plaintiff often appeared at the Conneaut Valley Health Center for psychological treatment as well as her physical pain. (R. at 213 – 16). At a September, 2008, exam, she was noted as being tearful, but also was pleasant, cooperative, alert, and oriented. (R. at 215). She demanded Xanax for her anxiety after her gynecologist no longer felt comfortable providing Plaintiff with the medication. (R. at 215). Plaintiff was also tearful at an October, 2008, exam. (R. at 213). In a December, 2008, exam, Plaintiff also asked the Health Center to prescribe her the pain killer MS Contin after Dr. Ruffa would no longer provide it to her. (R. at 210).

---

[4] The Global Assessment of Functioning Scale ("GAF") assesses an individual's psychological, social and occupational functioning with a score of 1 being the lowest and a score of 100 being the highest. The GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." *American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) 34 (4th ed. 2000). An individual with a GAF score of 60 may have "[m]oderate symptoms" or "moderate difficulty in social, occupational, or school functioning;" of 50 may have "[s]erious symptoms (e.g., suicidal ideation ....)" or "impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job);" of 40 may have "[s]ome impairment in reality testing or communication" or "major impairment in several areas, such as work or school, family relations, judgment, thinking or mood"; of 30 may have behavior "considerably influenced by delusions or hallucinations" or "serious impairment in communication or judgment (e.g., ... suicidal preoccupation)" or "inability to function in almost all areas ...; of 20 "[s]ome danger of hurting self or others ... or occasionally fails to maintain minimal personal hygiene ... or gross impairment in communication...." *Id.*

C.  <u>Medical Evaluations</u>

On January 1, 2008, Plaintiff underwent a clinical psychological disability evaluation with Michael Mercatoris, Ph.D. for the Bureau of Disability Determination. (R. at 262 – 69).  In his evaluation, Dr. Mercatoris noted that Plaintiff was well dressed, with good grooming and hygiene. (R. at 262 – 69).  Plaintiff was noted to be completely cooperative during the evaluation, made good eye contact, and was considered to be reasonably reliable. (R. at 262 – 69).  Plaintiff exhibited no unusual mannerisms, her posture and gait was normal, her motor behavior was normal, and her speech was normal. (R. at 262 – 69).  Plaintiff showed a full range of expression and her affect was appropriate. (R. at 262 – 69).

Plaintiff explained to Dr. Mercatoris that she suffered from endometriosis and deterioration of her spine. (R. at 262 – 69).  She complained of anxiety, depression, tearfulness, insomnia, panic attacks, and some suicidal thoughts – though, she denied being suicidal. (R. at 262 – 69).  Plaintiff's abstract thinking was fair. (R. at 262 – 69).  Dr. Mercatoris diagnosed major depression, panic disorder with agoraphobia, post-traumatic stress disorder ("PTSD"), and some mild obsessive compulsive symptoms. (R. at 262 – 69).  Plaintiff's prognosis was guarded. (R. at 262 – 69).

It was noted that Plaintiff was capable of cleaning, and – in fact – that she cleaned houses six to ten hours a week. (R. at 262 – 69).  Plaintiff was capable of shopping, cooking, and driving independently, could pay her bills independently, and could care for her personal hygiene and appearance. (R. at 262 – 69).  Plaintiff got along with her boyfriend and neighbors, though she would not initiate social contact when feeling depressed. (R. at 262 – 69).  She had no interest in group activities, but her social maturity was, "all right." (R. at 262 – 69).  Plaintiff got along well with co-workers, but avoided the public when feeling depressed. (R. at 262 – 69).

In terms of concentration and task completion, Plaintiff was found capable of carrying out simple instructions in simple work situations. (R. at 262 – 69). She could complete a task from beginning to end, sustain a routine, and make independent decisions. (R. at 262 – 69). Performing at a consistent pace would be precluded because of her physical pain. (R. at 262 – 69). In social situations, Plaintiff could adapt to simple changes in her work situation, though she may have problems coping with significant stress. (R. at 262 – 69). Plaintiff was either not limited, or only slightly or moderately limited, in all areas of functioning. (R. at 262 – 69).

A Psychiatric Review Technique completed by Edward Zuckerman, Ph.D. on January 11, 2008 found Plaintiff to suffer from depressive disorder, and panic disorder with agoraphobia. (R. at 270 – 82). However, Plaintiff was not limited in her activities of daily living, was mildly limited in maintaining social functioning, concentration, persistence, and pace, and showed no evidence of episodes of decompensation. (R. at 270 – 82). The findings of Dr. Mercatoris were given great weight. (R. at 270 – 82).

On January 15, 2008, Michael Niemiec, D.O. completed a physical residual functional capacity ("RFC") assessment of Plaintiff. (R. at 283 – 89). Based upon the medical records available at the time, Dr. Niemiec concluded that Plaintiff was capable of occasionally lifting up to twenty pounds, frequently lifting ten pounds, standing and walking approximately six hours of an eight hour workday, sitting approximately six hours, unlimited pushing and pulling, and occasional climbing, balancing, stooping, kneeling, crouching, and crawling. (R. at 283 – 89). Plaintiff was not otherwise functionally limited. (R. at 283 – 89).

Dr. Niemiec diagnosed Plaintiff with degenerative disc disease of the lumbar spine and endometriosis. (R. at 283 – 89). He further found that Plaintiff's activities of daily living were not significantly limited, and that the various forms of treatment that Plaintiff had received for

her physical conditions were generally effective in controlling her symptoms. (R. at 283 – 89). As such, Plaintiff was determined to be only partially credible. (R. at 283 – 89).

Vocational Counselor John Topalanonik, M.S. wrote a Vocational Report with respect to Plaintiff's functional capabilities on March 12, 2008. (R. at 290 – 95). Mr. Topalanonik reviewed the medical record available at that time and concluded that Plaintiff was unable to perform any substantial gainful activity, and further, that she met the requirements for disability under listings 12.04 (Affective Disorders) and 12.06 (Anxiety Related Disorders) in 20 C.F.R., Pt. 404, Subpt. P, Appx. 1. (R. at 290 – 95). Mr. Topalanonik determined that the objective evidence within the medical record established that Plaintiff suffered from major depressive disorder, panic disorder with agoraphobia, PTSD, and obsessive compulsive disorder ("OCD"). (R. at 290 – 95).

The symptoms Plaintiff experienced as a result of these disorders included consistent agoraphobia, hypervigilence, anxiety, depression, frequent tearfulness, tenseness, sleep disturbance, suicidal ideation, panic attacks, poor concentration, chronic pain, and reclusiveness. (R. at 290 – 95). Plaintiff was also the victim of childhood sexual abuse. (R. at 290 – 95). Mr. Topalanonik determined that Plaintiff was markedly limited in her ability to maintain a consistent pace, regular attendance, and concentration. (R. at 290 – 95). He specifically cited Dr. Mercatoris's evaluation of Plaintiff as establishing marked mental and functional impairments consistent with Mr. Topalanonik's conclusion that Plaintiff was unable to work. (R. at 290 – 95).

Psychologists Martin Meyer, Ph.D. and Julie Uran, Ph.D. performed a psychological evaluation of Plaintiff on November 20, 2008. (R. at 417 – 21). They noted that Plaintiff felt she would have difficulty maintaining a job because her pain and anxiety would cause her to, "snap." (R. at 417 – 21). Plaintiff also reported rage episodes in which she became verbally aggressive

and threw objects. (R. at 417 – 21). Plaintiff claimed that she had visual hallucinations, suicidal ideation, paranoia, and obsessive thoughts of orderliness. (R. at 417 – 21). She additionally alleged that she was sexually abused as a child, and that she was, "mentally abused," by most of her doctors. (R. at 417 – 21). Depression, anxiety, lack of concentration, insomnia, and chronic pain were also described. (R. at 417 – 21).

Drs. Meyer and Uran noted that Plaintiff had never received any mental health counseling in the past. (R. at 417 – 21). She drove herself to the evaluation independently, was cooperative, was properly attired, and exhibited good hygiene. (R. at 417 – 21). Plaintiff only made minimal eye contact, and did intimate that she was experiencing some pain. (R. at 417 – 21). She ambulated slowly and with a perceptible limp. (R. at 417 – 21). She also stood during a portion of her evaluation. (R. at 417 – 21).

Plaintiff did cry during her evaluation, but exhibited spontaneous and coherent speech, reported no perceptual disturbances of any significance, had normal and relevant thought process, appeared to be of average intelligence, had an adequate vocabulary, was alert and oriented, showed appropriate social judgment, was motivated, and was a good narrator of her personal history. (R. at 417 – 21). However, Plaintiff's critical thinking and mental flexibility were limited, her immediate memory was poor, she had some degree of difficulty with impulse control, and her insight was limited. (R. at 417 – 21).

Plaintiff's prognosis was considered fair to poor. (R. at 417 – 21). Her depression and anxiety were found to be in the severe range. (R. at 417 – 21). Her functional limitations included her ability to learn, her physical mobility, her history of recurrent job firings, her depression, anxiety, and agoraphobia – which could lead to missed work, and her anger. (R. at 417 – 21). She was recommended for social security disability, cognitive behavioral therapy,

and psychiatric medication. (R. at 417 – 21). Plaintiff was diagnosed with major depressive disorder, panic disorder with agoraphobia, and social phobia. (R. at 417 – 21). Plaintiff was given a GAF score of 50. (R. at 417 – 21).

    D. <u>Administrative Hearing</u>

At her hearing, Plaintiff testified that her sources of income included welfare benefits and a weekly fee from the sole remaining client of her cleaning business. (R. at 29). The income generated from the cleaning business was approximately $120.00 per week, of which she received only half because she hired outside help to do the cleaning for her. (R. at 29). Her inability to do the cleaning independently – beginning in March of 2004 – had allegedly cost Plaintiff all but one of her business's clients. (R. at 29 - 30). Plaintiff was able to do some of the cleaning work after 2004, but her pain eventually forced her to stop working altogether. (R. at 30 – 33). Prior to her claimed disability onset date, Plaintiff testified that she worked approximately thirty hours a week at her business. (R. at 35).

Plaintiff claimed that she first began to experience functional limitation while she was running a cleaning business in Florida, approximately one to two years prior to moving to Meadville. (R. at 36). She claimed that the strain of lifting vacuum cleaners and other equipment up and down stairs at various work sites negatively affected her back. (R. at 36). Her back had deteriorated to the point that one day she had so much pain she could not get herself out of her car, but required the help of some passersby. (R. at 37).

On a typical day, Plaintiff would rise at approximately 8:30 or 9:00 a.m. (R. at 38). She alleged experiencing difficulty getting out of bed and moving around until her pain medication kicked in. (R. at 38). She would then make herself breakfast and do household chores as necessary. (R. at 38). She might also sit and read or pot/ tend to her plants. (R. at 38). Plaintiff

testified that she maintained her driver's license and drove independently several times a week. (R. at 28 – 29). Plaintiff did her own shopping. (R. at 38). Plaintiff sometimes prepared lunch, and also made her own dinner. (R. at 38). When her pain was worse, she would often only eat breakfast cereal for dinner. (R. at 38).

Plaintiff did not often engage in social activities outside of her home, and would only visit with friends once or twice a month. (R. at 39). In the evening she would read, watch television, and talk on the phone. (R. at 39). Plaintiff typically went to bed at around 11:00 or 11:30 p.m. (R. at 39). Plaintiff claimed to have difficulty falling asleep due to her back pain. (R. at 39).

Physically, Plaintiff considered her inability to stand, sit, or walk without significant pain to be her greatest barrier to maintaining full time employment. (R. at 40). The pain was worst on the right side of her neck, her lower back, and both of her legs. (R. at 40). Increased physical activity intensified Plaintiff's pain. (R. at 40). Plaintiff took pain medication, and would administer ice packs and heating pads to help treat her discomfort. (R. at 40). Medication did not, allegedly, relieve Plaintiff's pain. (R. at 50). When she was aware that she would be engaging in prolonged activity, Plaintiff would also wear a back brace. (R. at 40 – 41). Plaintiff's doctors had not suggested more aggressive treatment methods. (R. at 41). Plaintiff claimed to be tired and in pain most mornings despite her treatment, and she spent much of her day in a reclining chair. (R. at 47). Sitting for too long a period of time also created pain. (R. at 48). If Plaintiff walked two city blocks, she would be exhausted and in a great deal of pain. (R. at 49 – 50). Bending and twisting also allegedly presented Plaintiff with significant difficulty. (R. at 49). Approximately half of the days of any given week, Plaintiff claimed to be unable to

do much more than sit in her home. (R. at 47 – 48). She was forced to give up exercising, bicycling, and water skiing due to pain. (R. at 50 – 51).

Plaintiff explained that she suffered from chronic bronchial infections as a complication arising from the ingestion of kerosene as a young child. (R. at 41). The lung damage suffered frequently required Plaintiff to take courses of antibiotics and steroids for relief from persistent infections. (R. at 41). Plaintiff also mentioned that she had suffered from the ill-effects of an ovarian cyst, but that two surgical interventions for the treatment of endometriosis subsequently resolved all pain associated with that condition. (R. at 45).

Psychologically, Plaintiff believed that her anxiety and depression precluded her from maintaining full-time employment. (R. at 42). Plaintiff described suffering from panic attacks when around large numbers of people in public places. (R. at 42). Increases in stress also triggered the attacks. (R. at 42). Plaintiff's depression was an everyday struggle, and was largely the result of Plaintiff's constant pain and resultant functional limitation. (R. at 43). Plaintiff received medication for both her anxiety and depression. (R. at 42 – 43, 46). However, Plaintiff had difficulty concentrating. (R. at 50). She also experienced frequent crying spells. (R. at 51). Plaintiff claimed that she had trouble getting along with other people, and that she often became angry and confrontational. (R. at 51). Plaintiff's inability to work well with others has allegedly been the reason for terminations from past employment. (R. at 52).

Following Plaintiff's testimony, the ALJ asked the vocational expert what jobs would be available to a hypothetical person of Plaintiff's age, education, and work experience, and who was limited to performing sedentary work allowing alternating between seated and standing positions, and limited to performing simple, repetitive tasks, without close interaction with the general public or exposure to excessive dust, smoke, fumes, or lung irritants. (R. at 53 – 54).

The vocational expert replied that such a person would be capable of working as an, "office clerk," with 137,000 positions available in the national economy, or, "surveillance system monitor," with 83,000 positions available. (R. at 54).

The ALJ then inquired as to whether mild to moderate pain and depression – which would not significantly interfere with the hypothetical person's ability to maintain concentration or complete tasks – would affect the availability of the jobs mentioned. (R. at 54). The vocational expert answered by stating that the jobs would still be available. (R. at 54). However, moderate to severe pain and depression which would frequently prevent or hinder the hypothetical person's ability to concentrate, complete tasks, or maintain a workstation for a prolonged period would eliminate all jobs. (R. at 54). Further, if the hypothetical person suffered limitations such as those described by Plaintiff during her testimony, no jobs would be available to that person. (R. at 54).

## V. DISCUSSION

In his decision, the ALJ found Plaintiff to suffer from severe impairments in the way of lumbrosacral disc herniation and degenerative disc disease, bronchitis, endometriosis, depression, and anxiety. (R. at 15). As a result, Plaintiff was determined to be limited to sedentary work allowing her to sit and stand, as necessary, to avoid close interaction with the public, to avoid exposure to excessive lung irritants, and to engage in no more than simple, repetitive tasks. (R. at 17). Despite these functional limitations, and based upon the testimony of the vocational expert at Plaintiff's administrative hearing, job opportunities existed in significant numbers in the national economy for a person so limited. (R. at 53 – 55). Plaintiff was, therefore, not entitled to SSI or DIB. (R. at 23).

In her motion, Plaintiff objects to this determination by the ALJ, arguing that the ALJ erred in formulating his RFC assessment and hypothetical question to the vocational expert, by failing to give proper consideration to the opinions of various medical sources in the record, and in discrediting Plaintiff's subjective complaints by overstating the true extent of her daily activities. (ECF No. 8 at 6 – 17).

When rendering a decision, an ALJ must provide sufficient explanation of his or her final determination to provide a reviewing court with the benefit of the factual basis underlying the ultimate disability finding. *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981) (citing *S.E.C. v. Chenery Corp.*, 318 U.S. 80, 94 (1943)). The ALJ need only discuss the most pertinent, relevant evidence bearing upon a claimant's disability status, but must provide sufficient discussion to allow the court to determine whether any rejection of potentially pertinent, relevant evidence was proper. *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 203 – 04 (3d Cir. 2008) (citing *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 121 (3d Cir. 2000); *Cotter*, 642 F.2d at 706). The ALJ did not fully meet his obligations in the present case.

Plaintiff first argues that the ALJ's RFC and hypothetical to the vocational expert was insufficient because the ALJ was allegedly vague in describing Plaintiff's sit/ stand option. (ECF No. 8 at 7). In his hypothetical at Plaintiff's administrative hearing, the ALJ advised the vocational expert that any available employment would require the ability to, "periodically be able to alternate between sitting and standing." (R. at 54). The ALJ's RFC provided that Plaintiff must be able to, "sit or stand as necessary." (R. at 17). It is the Plaintiff's contention that this was not adequate under S.S.R. 83-12[5] and S.S.R. 96-9p[6] to convey Plaintiff's true functional limitation. (ECF No. 8 at 7).

---

[5] "Unskilled types of jobs are particularly structured so that a person cannot ordinarily sit or stand at will." S.S.R. 83-12.

RFC assessments and hypothetical questions must be a reflection of all of a claimant's credibly established impairments. *Ramirez v. Barnhart*, 372 F.3d 546, 552 (3d Cir. 2004). Moreover, an RFC assessment or hypothetical question should be specific enough to adequately convey a claimant's functional limitations. *Id.* at 552, 555 – 56. However, when the evidence on record persuades an ALJ to conclude that a particular impairment is so minimal or negligible that it would not limit a claimant's functional capacity beyond any accommodations already provided in the RFC assessment or hypothetical, greater specificity is not required. *Id.* at 555 – 56; *Galvin v. Comm'r Soc. Sec.*, 2009 WL 2177216, *10 (W.D.Pa. July 22, 2009); *Christner v. Astrue*, 2009 WL 186010, *9 (W.D.Pa. January 27, 2009).

Here, there was no evidence that established Plaintiff's exact limitations with respect to sitting and standing. There was, however, the physical RFC assessment completed by Dr. Niemiec which concluded that Plaintiff was capable of sitting six hours of an eight hour workday and standing or walking six hours. (R. at 283 – 89). No evidence is provided by Plaintiff that contradicts this finding. As argued by Plaintiff, sedentary work often requires sitting for six hours out of an eight hour workday. (ECF No. 8 at 7). The evidence on record established that Plaintiff was capable of meeting this requirement, and the Court, therefore, can find no reason why the ALJ's RFC assessment or hypothetical required greater specificity to properly accommodate this functional limitation.

Plaintiff further argues that the ALJ's RFC assessment was flawed because it did not specifically list Drs. Meyer and Uran's findings regarding Plaintiff's irritability and attention

---

[6] "'[S]edentary work' represents a significantly restricted range of work . . . Although a sedentary job is defined as one that involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. 'Occasionally' means occurring from very little up to one-third of the time, and would generally total no more than about 2 hours of an 8-hour workday. Sitting would generally total about 6 hours of an 8-hour workday . . . The RFC assessment must be specific as to the frequency of the individual's need to alternate sitting and standing." S.S.R. 96-9p.

deficits. (ECF No. 8 at 8 – 10). However, it is clear that the ALJ was justified in not including such limitations. Earlier findings by Drs. Meyer and Uran indicated that Plaintiff was cooperative, exhibited normal thought and speech, was of average intelligence, and showed appropriate social judgment – mitigating the severity of her limitations. (R. at 20, 262 – 69, 417 – 21). Further, Drs. Meyer and Uran never indicated the severity of the limitations listed in their assessment, or the impact upon Plaintiff's ability to engage in substantial gainful employment. (R. at 417 – 21). As a result, the Court is not persuaded that the ALJ's RFC assessment or hypothetical were inadequate in this respect.

Plaintiff's second argument is that the ALJ failed to appropriately weigh the medical opinions of her treating and examining sources. (ECF No. 8 at 11). With respect to treating physicians, the Court of Appeals for the Third Circuit has held that their opinions may be entitled to great weight – considered conclusive unless directly contradicted by evidence in a claimant's medical record – particularly where the physician's findings are based upon "continuing observation of the patient's condition over a prolonged period of time." *Brownawell v. Commissioner of Social Security*, 554 F.3d 352, 355 (3d Cir. 2008); *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999) (citing *Rocco v. Heckler* 826 F.2d 1348, 1350 (3d Cir. 1987)). However, a showing of contradictory evidence and an accompanying explanation will allow an ALJ to reject a treating physician's opinion outright, or accord it less weight. *Id.*

In such a case, it is expected that the ALJ will be as "comprehensive and analytical as feasible." *Cotter*, 642 F.2d at 705. The explanation should allow a reviewing court the ability to determine if "significant probative evidence was not credited or simply ignored." *Fargnoli*, 247 F.3d at 42. The ALJ "cannot reject evidence for no reason or for the wrong reason." *Morales v. Apfel*, 255 F.3d 310, 317 (3d Cir. 2000) (citing *Mason v. Shalala*, 994 F.2d 1058, 1066 (3d Cir.

1993)).  Moreover, the ALJ "should not substitute his lay opinion for the medical opinion of experts," or engage in "pure speculation" unsupported by the record. *Id.* at 318-19; *Daring v. Heckler*, 727 F.2d 64, 70 (3d Cir. 1984).

Here, a reading of the ALJ's opinion shows that the ALJ considered much of the evidence provided by Dr. Ramirez, Dr. Anderson, and Dr. Colantonio[7], clearly giving them significant weight. (R. at 17 – 21).  Nowhere does Plaintiff point to objective medical evidence recorded by these doctors that the ALJ rejected outright. Further, it must be noted that none of Plaintiff's treating physicians conducted functional capacity assessments or indicated that Plaintiff would be functionally limited in, or precluded from, full-time employment.  Plaintiff fails to explain what further analysis was required by the ALJ.  Here, the ALJ gave Plaintiff's treating physicians adequate consideration.

Plaintiff further objects to the significant weight the ALJ explicitly gave to the opinions of Dr. Mercatoris, Dr. Zuckerman, and Dr. Niemiec, as opposed to the lesser weight attributed to the opinions of Dr. Meyer, Dr. Urban, and Mr. Topalanonik. (ECF No. 8 at 12 – 15).  Plaintiff specifically attacks the ALJ's reliance upon the evaluation of Dr. Niemiec in several respects. (ECF No 8 at 13).  First, Plaintiff attacks the value of the assessment because Dr. Niemiec's evaluation required only checking boxes. (ECF No. 8 at 12).  Dr. Niemiec's assessment, however, differs from the type of evaluation discussed in *Mason v. Shalala*, 994 F.2d 1058, 1065 – 66 (3d Cir. 1993) (citing *Brewster v. Heckler*, 768 F.2d 581, 585 (3d Cir. 1986)), where the court described RFC assessments unaccompanied by narrative explanations as weak evidence, at best.  Here, Dr. Niemiec presented a comprehensive list of the medical records consulted and the

---

[7] In her argument, Plaintiff includes, "Ms. Gushard (psychologist)," amongst the list of physicians whose opinions were entitled to deference by the ALJ in his opinion. (ECF No. 8 at 11).  Ms. Gushard, however, is not a psychologist or doctor, and does not appear to have a significant treatment history with Plaintiff beyond a September 4, 2007, Psychosocial Evaluation. (R. at 253 – 55).

objective findings therein which lent support for his conclusions regarding Plaintiff's physical limitations. (R. at 283 – 89). Moreover, while giving significant weight to the findings of Dr. Niemiec, the ALJ did not adopt his findings or give the findings controlling weight, instead discussing the findings in the context of Dr. Mercatoris and Dr. Zuckerman's opinions, as well as the supporting evidence on record. I find no error in the ALJ's treatment of Dr. Niemiec's opinion in this regard.

Plaintiff also argues that Dr. Niemiec's opinion was of limited value because it predated Plaintiff's initial disability determination and, therefore, he would not have had the entire record available for his review – specifically, the evidence of Plaintiff's hysterectomy and related physical difficulties. (ECF No. 8 at 13 – 14). However, there is no evidence that Dr. Niemiec's evaluation was not a valid assessment of Plaintiff's capabilities, at the time of completion, and further, no evidence was put forth by Plaintiff which would suggest that the assessment of Plaintiff's functional capabilities was no longer valid due to subsequent physical developments. While it is true that Plaintiff had endometriosis requiring a hysterectomy in 2008, which Dr. Niemiec could not have considered, the record indicated that Plaintiff saw improvement in her endometriosis, until August of 2008, with Lupron injections. (R. at 405 – 11). Additionally, following her hysterectomy, Plaintiff testified at her hearing that her symptoms relating to her endometriosis had resolved. (R. at 45). As such, the Court does not find that Dr. Niemiec's decision was given undue weight.

Plaintiff fares better, however, with respect to her remaining arguments. Plaintiff argues that the ALJ erred in failing to adequately discuss discrepancies between his RFC assessment and those of Dr. Zuckerman and Dr. Mercatoris. (ECF No. 8 at 14 – 15). The ALJ is required to provide some level of explanation for his failure to accept limitations findings by these doctors,

and did not do so. *See Cotter*, 642 F.2d at 704 – 705 (wherein the court held that the ALJ has a duty to evaluate all relevant evidence, and failure to explain the weight given to probative evidence, and the underlying factual basis for this weight, deprives the court of the ability to determine whether significant evidence was credited properly or simply ignored). Dr. Mercatoris's finding that Plaintiff was precluded from performing at a consistent pace was neither discussed nor accommodated in the ALJ's RFC assessment. Neither were his moderate limitations findings with respect to responding to work pressures and changes in routine work settings, and interacting with supervisors and co-workers, so discussed or included. (ECF No. 8 at 8). Consequently, a remand is required so that the ALJ can address this evidence consistent with the dictates of *Cotter.*

Plaintiff's final objection to the ALJ's determination concerns his use of Plaintiff's activities of daily living to discredit her allegations of limitation. The ALJ erred, here, by misstating her actual level of activity by relying primarily upon Dr. Mercatoris's report which no longer reflected Plaintiff's most current activity level with respect to working. The ALJ failed to properly characterize Plaintiff's work situation and her alleged decline in hours worked over time. The ALJ also erred when he misquoted Dr. Niemiec. (R. at 19). Dr. Niemiec stated only that Plaintiff's activities were not significantly limited – he made no specific findings regarding what activities were and were not affected. (R. at 289). On remand, therefore, the ALJ should reassess the nature of the Plaintiff's daily activities.

### VI. CONCLUSION

Based upon the foregoing, the Defendant's Motion for Summary Judgment will be denied and the Plaintiff's Motion for Summary Judgment will be granted only to the extent she seeks a

remand for further consideration. The matter will be remanded to the Commissioner for further proceedings.[8] An appropriate Order follows.

---

[8] The ALJ is directed to reopen the record and allow the parties to be heard via submissions or otherwise as to the issue addressed in this Memorandum Opinion. *See Thomas v. Comm'r of Soc. Sec.*, 625 F.3d 800-01 (3rd Cir. 2010).

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

SHARLEEN EDDY,                          )
                                        )
                    Plaintiff           )
                                        )
        v.                              )            Civil Action No. 10-130
                                        )
COMMISSIONER OF                         )
SOCIAL SECURITY,                        )
                                        )
                    Defendant           )

## ORDER

AND NOW, this 9th day of June, 2011, for the reasons stated in the accompanying Memorandum Opinion,

IT IS HEREBY ORDERED that the Defendant's Motion for Summary Judgment [ECF No. 9] is DENIED, and the Plaintiff's Motion for Summary Judgment [ECF No. 6] is GRANTED only to the extent she seeks a remand for further consideration by the Commissioner. The case is hereby REMANDED to the Commissioner of Social Security for further proceedings consistent with the accompanying Memorandum Opinion.

The clerk is hereby directed to mark the case closed.

s/ Sean J. McLaughlin
United States District Judge

cm: All parties of record.